Nicolas Morgan
Adam D. Schneir

Attorneys for Plaintiff
Securities and Exchange Commission
Randall R. Lee, Regional Director
Sandra J. Harris, Associate Regional Director
Briane Nelson Mitchell, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>STEPHEN J. TREADWAY AND KENNETH W. CORBA,<br><br>    Defendant(s). | 04 Civ.  3464 (VM)<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa, Sections 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(e)(1) & 80b-14, and Sections 42(d), 42(e)(1) and 44 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. §§ 80a-41(d), 80a-41(e)(1) & 80a-43. Defendants have, directly or indirectly, made use of the means or instrumentalities

of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, and Section 44 of the Investment Company Act, 15 U.S.C. § 80a-43, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3.    This action concerns a fraud perpetrated by defendants on unsuspecting investors in several mutual funds that are part of the PIMCO Funds: Multi-Manager Series ("PIMCO Funds" or the "Funds"). The PIMCO Funds' prospectuses represented to investors that the Funds would limit a practice known as market timing (the frequent buying and selling of shares of the same mutual fund). Consistent with this policy, the Funds actively policed market timing activities and prevented some Fund shareholders from engaging in it. However, without any disclosure to Fund shareholders (and contrary to representations), the defendants orchestrated a secret arrangement with one preferred client to allow market timing in amounts exceeding $4 billion in trading.

4.    From February 2002 to April 2003, the PIMCO Funds' advisers, PIMCO Advisers Fund Management LLC ("PAFM") and PEA Capital LLC ("PEA"), and the Funds' distributing broker-dealer, PIMCO Advisors Distributors LLC ("PAD") (collectively, "PIMCO Entities"), provided "timing capacity" in their mutual funds to a market timer, Canary Capital Partners LLC ("Canary"), in return for Canary's investment of "sticky assets" in a mutual fund and a hedge fund from which PAFM and PEA earned management fees. "Sticky assets" are long-term investments made in exchange for permitting market timing in mutual

funds. The prospectuses for the mutual funds failed to disclose that an agreement had been made to permit timing in the funds in exchange for sticky assets. In addition, the prospectuses gave the misleading impression that the mutual funds discouraged timing.

5. At the height of the agreement, Canary used over $60 million in timing capacity in several different mutual funds and invested $27 million in sticky assets into a mutual fund and a hedge fund.

6. Stephen J. Treadway, the former CEO of PAFM and PAD, as well as the former Chairman of the Board of Trustees for the PIMCO Funds: Multi-Manager Series, approved the market timing arrangement in approximately January 2002. Treadway, however, did not disclose his knowledge of the arrangement to the Board of Trustees until approximately September 2003.

7. Kenneth W. Corba, PEA's former Chief Executive Officer, negotiated and approved the timing and sticky asset arrangement with Canary. He also managed the PIMCO Growth Fund, which provided $30 million in market timing capacity to Canary, and the PIMCO Select Growth Fund, which received $25 million in sticky assets from Canary.

8. Defendants permitted the arrangement with Canary despite their awareness of the potential harmful effects of timing on mutual funds and an ability to detect and prevent timing.

9. Through this conduct, Treadway and Corba violated Section 17(a) of the Securities Act, violated, or aided and abetted violations of, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, violated Section 34(b) of the Investment Company Act, aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act, and breached their fiduciary duties under Section 36(a) of the Investment Company Act.

/ / /

/ / /

## THE DEFENDANTS

10.    Stephen J. Treadway ("Treadway"), age 56, a resident of New York, New York, was the Chief Executive Officer and a Managing Director of PAFM, the Chief Executive Officer and a Managing Director of PAD, and the Chairman of the Board of Trustees for the PIMCO Funds.

11.    Kenneth W. Corba ("Corba"), age 51, a resident of Greenwich, Connecticut, was the Chief Executive Officer, Chief Investment Officer, and a Managing Director of PEA. He was also the portfolio manager for the PEA Growth and Select Growth Funds. Corba joined PEA in 1999 and resigned from PEA on April 13, 2004.

## RELATED PARTIES

12.    PA Fund Management LLC, f/k/a PIMCO Advisors Fund Management LLC ("PAFM"), a Delaware limited liability company located in New York, New York, is an investment adviser registered with the Commission under the Advisers Act. It is an investment adviser and administrator for the PIMCO Funds: Multi-Manager Series (the "PIMCO Funds" or the "Funds"), a registered investment company comprised of 45 separate investment series or mutual funds. PAFM provides investment supervisory services to the PIMCO Funds, and for these services, the Funds pay PAFM an annual advisory fee consisting of a percentage of average daily net assets held by the Funds.

13.    PEA Capital LLC, f/k/a PIMCO Equity Advisors LLC ("PEA"), a Delaware limited liability company located in New York, New York, is an investment adviser registered with the Commission under the Advisers Act. It is the investment sub-adviser for the PEA Growth Fund, PEA Opportunity Fund, PEA Target Fund, PEA Innovation Fund, and several other funds, all of which were part of the PIMCO Funds. In 2002, PEA also served as the sub-adviser for the Select Growth Fund. As the sub-adviser, PEA has full investment discretion and makes all determinations with respect to the investment of a fund's assets

- 4 -

subject to the general supervision of PAFM and the Board of Trustees of the PIMCO Funds. On February 6, 2004, PEA filed a Form ADV with the Commission stating that it had changed its name from PIMCO Equity Advisors LLC to PEA Capital LLC. As of December 31, 2003, accounts managed by PEA had combined assets of approximately $11.3 billion.

14.    PA Distributors LLC, f/k/a PIMCO Advisors Distributors LLC ("PAD"), a Delaware limited liability company located in Stamford, Connecticut, is a broker-dealer registered with the Commission under the Exchange Act. PAD serves as the distributor for the PIMCO Funds. PAD also employed individuals responsible for monitoring trading activity to prevent or limit market timing in the PIMCO Funds (the "timing police").

## RELEVANT ENTITY

15.    Canary Capital Partners, LLC was, at all relevant times, a domestic hedge fund, and Canary Capital Partners, Ltd. was, at all relevant times, an offshore hedge fund domiciled in Bermuda, managed by an investment adviser, Canary Investment Management, LLC, and its principal, Edward J. Stern (collectively "Canary"). African Grey Capital Associates LLC was an entity formed by Stern and affiliated with the various Canary entities. Canary has offices in Secaucus, New Jersey and New York, New York.

## THE FRAUDULENT SCHEME

### A.    The Timing Agreement with Canary

16.    From 2001 to the present, PAFM and PEA collectively served as the adviser and sub-adviser for certain mutual funds offered by the PIMCO Funds: Multi-Manager Series. These funds included the Growth, Target, Opportunity, Innovation, Select Growth, and Value Funds, among others. In or around October 2002, the Select Growth Fund was merged into the Growth Fund. After this time, the Select Growth Fund ceased to exist.

17.    In October 2001, representatives of a registered broker-dealer (the "broker representatives") were introduced to PEA by a third party trust company. The representatives sought market timing capacity in the PIMCO family of funds for their clients.

18.    In or around early November 2001, the broker representatives met with Corba and PEA's former Senior Vice President of Institutional Marketing. At this meeting, which occurred in Corba's office, the broker representatives stated their interest in arranging for approximately $100 million in trading capacity in the PIMCO family of funds at a rate of three to four round-trip exchanges per month. The broker representatives also specified that they only wanted capacity in funds where their client's investment would consist of 3% or less of the fund value. In exchange for this ability to market time, the broker representatives proposed a long-term investment consisting of 25% of the value of trading capacity into one of the PIMCO Entities' other investment products.

19.    After the meeting with the broker representatives, Corba met with PEA's managing directors and portfolio managers regarding the proposed arrangement. At this meeting, Corba indicated that PEA was entering a market timing relationship involving PEA's growth-type funds (i.e., the Growth, Target, and Innovation Funds).

20.    After the meeting with the managing directors and portfolio managers, Corba instructed PEA's former Senior Vice President of Institutional Marketing to work out an agreement that permitted trading capacity in the PIMCO Growth, Target, and Innovation Funds. The terms of the agreement were that Canary would invest $100 million in the Growth, Target, and Innovation Funds; the assets could be traded in up to four round-trips per month; the amount of money invested in each fund by Canary could not exceed 3% of the fund's assets; and Canary agreed to make a long-term investment representing 25% of the assets under management into the PIMCO Select Growth Fund.

21.    In or about January 2002, Corba met with Treadway to discuss the proposed market timing relationship. At this meeting, Corba told Treadway that a member of a very wealthy and reputable family, Edward Stern, was interested in the PIMCO Funds and in establishing a long-term relationship with PEA. Corba also told Treadway at this meeting that he wanted to get Stern to invest into the Select Growth Fund. Corba further told Treadway that Stern was interested in active trading that could potentially run afoul of the PIMCO Entities' market timing policies. In describing the proposed arrangement to Treadway, Corba stated that the PIMCO Entities would be informed about Stern's trades and that Stern would not invest more than 3% into any one of the PEA-managed funds at any one time.

22.    Corba needed Treadway's approval to proceed with the Stern relationship because it involved a significant amount of money and the accommodation of market timing. Corba also needed Treadway's approval because Treadway was the Chairman of the PIMCO Funds and the PAD "timing police" ultimately reported to Treadway. At the meeting with Corba, Treadway approved the relationship with Stern.

23.    In February 2002, Canary executed its first round-trip exchange in the PIMCO Innovation Fund. After the execution of this transaction, however, the portfolio manager for the PIMCO Innovation Fund decided that the Canary timing activity was too disruptive and forbade further trading by Canary in the fund.

24.    On or about March 5, 2002, Corba and PEA's former Senior Vice President of Institutional Marketing met with Stern and the broker representatives at The Racquet Club in New York City and discussed, among other things, the market timing agreement between PEA and Canary. They discussed that the agreement permitted four round-trip exchanges in each fund per month and included a 25% long-term investment in the PIMCO Select Growth Fund. In addition, Stern expressed an interest in obtaining additional capacity in other

PIMCO Funds and investing in a PIMCO hedge fund. Corba told Stern about the PIMCO Equity Advisors Horizon Fund LP (the "Horizon Fund") and, specifically, that it had a good performance record. The Horizon Fund was a hedge fund focused on small cap growth with assets of $31.1 million as of February 28, 2003.

25.    Throughout March 2002, Stern continued to express an interest in obtaining additional capacity in other PIMCO Funds. Corba knew that Stern was disappointed about losing capacity in the Innovation Fund. Corba, therefore, told PEA's former Senior Vice President of Institutional Marketing that Canary could consider the Opportunity Fund if they were interested but that because it was a much smaller fund the capacity level would not be the same as what they had with the Innovation Fund.

26.    On or about March 22, 2002, Stern met with the portfolio manager for the Horizon and Opportunity Funds and PEA's former Senior Vice President of Institutional Marketing to learn about the Horizon Fund. On March 25, 2002, the former Senior Vice President of Institutional Marketing informed Corba that Canary still wanted to invest in the Innovation and Opportunity Funds as part of the deal. Corba knew that part of the long term investment in the Horizon Fund would be to gain further access to the funds including the Opportunity Fund.

27.    Soon after the March 22, 2002 meeting with Stern, Canary invested $2 million in the Horizon Fund on a long-term basis and received $5 million in trading capacity in the Opportunity Fund.

28.    In addition, Canary obtained a waiver of the lock-up period for investments into the Horizon Fund in the event the market timing relationship with Canary and PEA ended.

29.    PEA received 1% of total assets under management and a performance fee consisting of 20% of the net profits generated by the fund in annual fees from the Horizon Fund. Likewise, PAFM and PEA collectively

received an advisory fee of 0.65% of net assets under management for the Opportunity Fund.

**B.    Canary's Trading in the PIMCO Funds**

30.    From on or around February 1, 2002 through February 8, 2002, Canary invested $25 million in sticky or long-term assets into the PIMCO Select Growth Fund, which almost doubled the assets of that fund. Between February 4 and February 7, 2002, Canary also placed approximately $60 million into a combination of fixed-income PIMCO funds for timing purposes. On or around February 8, 2002, Canary began its timing activities by purchasing approximately $24 million in both the PIMCO Target and Innovation Funds. On February 12, 2002, Corba and Treadway, among others, received an e-mail notification from a member of PAD's "timing police" regarding the broker representative's initial transactions on behalf of the Canary accounts.

31.    From on or around February 8, 2002 through April 3, 2002, Canary traded extensively into and out of the PIMCO Target Fund from one of the following funds: PIMCO Total Return Fund, PIMCO Real Return Fund, PIMCO Short-Term Fund, or the PIMCO Low Duration Fund (the "fixed-income PIMCO funds") or the PIMCO money market. The fixed-income PIMCO funds were not parties to the special Canary arrangement. In fact, in March 2002, the fixed-income PIMCO funds requested that this trading activity cease.

32.    From on or around February 8, 2002 through February 21, 2002, Canary also traded in the PIMCO Innovation Fund. The Innovation Fund had an investment strategy, however, that was negatively affected by the extreme inflow and outflow of cash. Thus, after the first round-trip exchange allowed by the Canary arrangement, the portfolio manager for Innovation determined that the market timing activity was disruptive to the fund.

33.    As a result of being forced to stop its activities in the Innovation Fund, Canary reduced its total timing capacity at PIMCO Funds from the

originally promised $100 million to approximately $60 million. The original agreement linked the amount of money under management as sticky assets to the volume of timing capacity. On or around April 12, 2002, Canary lowered its "sticky asset" investment in the PIMCO Select Growth Fund from $25 million to $20 million to reflect the lower timing capacity Canary received in the PIMCO Funds. On or around this same date, the broker representatives notified Corba and others about the $5 million redemption from the Select Growth Fund. Canary began its timing activities in the PIMCO Growth Fund on or around April 11, 2002.

34.     Canary timed the Growth and Target Funds from April 2002 until November 2002. Throughout this period of time, the broker representatives e-mailed Corba and others trade notifications for the purchases and redemptions of the Funds. These notifications demonstrated the frequent trading activities in the Canary accounts.

35.     From April 2002 through November 2002, Canary made approximately 28 round-trip exchanges in the Growth Fund. The overall dollar volume of these exchanges was nearly $1.8 billion. From February 2002 through November 2002, Canary made approximately 40 round-trip exchanges in the Target Fund. The overall dollar volume of these exchanges was over $2 billion.

36.     Canary also invested $2 million in sticky assets into the Horizon Fund on or around April 1, 2002. Canary then placed $5 million in the Opportunity Fund on or around April 11, 2002, and market timed that account until on or around April 3, 2003. From April 2002 through April 2003, Canary made approximately 40 round-trip exchanges in the Opportunity Fund. The overall dollar volume of these exchanges was approximately $371 million.

## C.     The PIMCO Funds' Disclosures

37.     From 2001 to 2003, the prospectus for the PIMCO Funds, which each of the defendants had knowledge of, stated that a pattern of exchanges

characteristic of market timing strategies may be deemed detrimental to the fund and limited the number of round-trip exchanges available to investors. Specifically, in the November 2001 and February 2002 prospectuses, the PIMCO Funds made the following disclosure regarding market timing:

> The Trust reserves the right to refuse exchange purchases, if, in the judgment of PIMCO Advisors, the purchase would adversely affect a Fund and its shareholders. In particular, a pattern of exchanges characteristic of "market-timing" strategies may be deemed by PIMCO Advisors to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges an investor may make. An investor makes a "round trip" exchange when the investor purchases shares of a particular Fund, subsequently exchanges those shares for shares of a different PIMCO Fund and then exchanges back into the originally purchased Fund. The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally purchased Fund) more than six round trip exchanges in any twelve-month period. Although the Trust has no current intention of terminating or modifying the exchange privilege other than as set forth in the preceding sentence, it reserves the right to do so at any time.

From November 2001 through September 2003, there were only minor changes to this language. The PIMCO Funds' Statements of Additional Information and Shareholders Guides also made similar disclosures concerning market timing.

38.     These disclosures were false and misleading, and defendants knew they were false and misleading as a result of the secret market timing arrangement they entered into with Canary. None of the prospectuses disclosed that selected shareholders could make long-term investments in some PIMCO investment vehicles in order to obtain the right to market time PIMCO mutual funds. Treadway signed the PIMCO Funds' registration statements that were filed with the Commission.

39.     Corba knew the PIMCO Funds discouraged market timing and that the market timing arrangement with Canary was an exception to such policy.

- 11 -

Further, as CEO of PEA, the investment sub-adviser at which all of the market timing occurred, as portfolio manager for the PEA Growth Fund, one of the funds that provided timing capacity for Canary, and as portfolio manager for the PEA Select Growth Fund, the fund that received $25 million in sticky assets from Canary, Corba had authority over the content of portions of the fund summary statements within the prospectus. Specifically, he provided information concerning fund investment objectives and guidelines, fund holdings, and fund capitalization. In doing so, Corba knew that such information would be directly incorporated into the prospectus and thereby disseminated to the public. In providing this information, Corba made material misrepresentations and omissions by failing to disclose the sticky asset and market timing arrangement with Canary.

40.    PAD froze nearly 400 accounts in 2002 because of market timing or frequent trading in those accounts. From January 2003 through October 2003, PAD sent 104 warning letters to registered representatives, prohibited 67 registered representatives from selling PIMCO Funds, and froze 317 accounts.

41.    In fact, in furtherance of the stated policy, PAD prevented some shareholders from performing exchanges based on the policy articulated in the prospectus. PAD monitored the trading patterns in the PIMCO Funds and, in so doing, was able to identify some market timers. When PAD identified market timers, it sent letters to them warning that they could not use PIMCO Funds to execute market timing strategies. Specifically, these letters stated that frequent transactions violated prospectus policies and were detrimental to the Funds and harmful to shareholders. As a further measure, PAD instructed the transfer agent for the PIMCO Funds to block or freeze trades in market timers' accounts.

42.    PAD maintained a log listing broker-dealers and registered representatives identified as market timers. On the log, PAD identified the market timer and the action taken to deter that entity from continuing to time the PIMCO Funds, including whether a warning letter was sent, the account was frozen, or the

account was closed.

43.    In at least one communication with a broker dealer, PAD interpreted the prospectus disclosure as a strict prohibition against market timing.

44.    Contrary to the disclosures in its prospectuses and to shareholders, the PIMCO Entities allowed Canary to engage in a practice of market timing in exchange for long-term investments in a PIMCO mutual fund and a hedge fund. Specifically, as described above, the PIMCO Entities allowed Canary to make approximately 108 round-trip exchanges from February 2002 to April 2003 pursuant to Canary's special timing arrangement.

## D.    The Adverse Effects of Market Timing on the PIMCO Funds

45.    In May 2002, PAFM advised the Board of Trustees for the PIMCO Funds, including Treadway, of the adverse impact that market timers had on mutual funds. The negative impacts were threefold: (1) increased trading and brokerage costs; (2) disruption of portfolio management activities; and (3) additional capital gains that increased shareholders' tax liabilities. After receipt of this advice, the Board of Trustees imposed a redemption fee on short-term exchanges in certain classes of fund shares to, among other things, reimburse the shareholders for costs of market timing and create a disincentive for market timing activity. But the Board of Trustees did not impose a similar fee on the retail class of shares used by Canary in its special arrangement. These redemption fees became effective on June 10, 2002.

46.    At a June 20, 2002 Board of Trustees meeting, Treadway received authority to impose redemption fees on the class of shares used by Canary (on a temporary basis prior to the September board meeting) if he believed such action was in the best interests of the shareholders. However, these redemption fees were not imposed on that class of shares until February 2004.

47.    As discussed above, Treadway, the Chairman of the Board of Trustees for the PIMCO Funds, had approved the market timing arrangement with

- 13 -

Canary prior to PAFM's advice to the Board of Trustees. Treadway, however, did not disclose the arrangement to the Board of Trustees during the time these redemption fees were being considered. In fact, Treadway did not disclose his knowledge of the arrangement to the Board of Trustees until approximately September 2003.

48.    Moreover, the Canary trading was the type of market timing that PAD prohibited for other investors because of potential detriment to the Funds. In fact, when Canary tried to market time through Cockatoo Capital -- a Canary entity without a special arrangement -- PAD sent out a warning letter stating that the frequency of transactions violated prospectus policies and was detrimental to the fund and its shareholders.

**E.    Treadway and Corba Eventually Terminate the Canary Relationship**

49.    Both Treadway and Corba received warning signals concerning Canary's trading activities soon after approving the Canary relationship. On March 25, 2002, PEA's former Senior Vice President of Institutional Marketing forwarded to Corba a March 10, 2002 e-mail exchange between Canary and the former Senior Vice President of Institutional Marketing, which provided an early indication to Corba that Canary's frequent trading activity was problematic and raised various concerns at the fixed-income PIMCO funds.

50.    On April 26, 2002, Corba, Treadway, and others received an e-mail from a member of PAD's "timing police" stating that one of the Canary accounts had already executed five round-trip exchanges in the Target Fund for the month of April. The e-mail further stated that the Canary accounts "tend[ed] to divide the movement of shares (in or out of the fund[s]) across a couple of days thereby increasing the number of individual transactions hitting the account[s]." In response to this e-mail, Treadway instructed a senior PAD officer to formulate a "more precise and limiting definition of what constitutes 4 round trips."

51.    On April 29, 2002, the same member of PAD's "timing police" sent an e-mail to the broker representatives, Treadway, Corba, and others alerting them that the rapid fire trading activity in the Canary accounts resulted in trade settlement problems.

52.    On May 17, 2002, Corba sent an e-mail to one of the broker representatives, and others, characterizing Canary's trading as "the most opportunistic but extreme form of market timing [he had] ever seen."

53.    On May 23, 2002, Corba sent one of the broker representatives an e-mail referring to "another one day transaction" by Canary.  On June 4 and 11, 2002, Corba sent one of the broker representatives additional e-mails further complaining about Canary's frequent one-day round trip transactions.

54.    Treadway and Corba discussed the market timing arrangement approximately once per month.  Around late April or early May 2002, Treadway told Corba that Canary's trading levels and volumes were higher than anticipated and that the Canary accounts were more actively traded than Treadway expected. Corba agreed with Treadway.  Nevertheless, Treadway and Corba allowed Canary to continue market timing the PIMCO Funds for several more months.

55.    In or around late August or early September 2002, Treadway and Corba finally decided to terminate the Canary arrangement.  Despite that decision, Canary was allowed to continue timing the Target and Growth Funds until November 2002.  Indeed, Canary was allowed to time the Target and Growth Funds until just after the Select Growth Fund merged with the Growth Fund in October 2002.  Just prior to the merger of these two mutual funds, Canary redeemed its sticky asset investment from the Select Growth Fund.  Canary redeemed its shares in the Select Growth Fund on or around October 11, 2002, but continued its timing activity until on or around November 21, 2002, at which point all funds were withdrawn from the Target and Growth Funds.

56.    Canary continued, however, to time the Opportunity Fund until on or around April 3, 2003, and kept its sticky asset investment in the Horizon Fund until on or around May 31, 2003.

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against Both Defendants)

57.    The Commission realleges and incorporates by reference ¶¶ 1 through 56 above.

58.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

      a.    with scienter, employed devices, schemes, or artifices to defraud;

      b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

59.    By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

/ / /

/ / /

/ / /

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE
### PURCHASE OR SALE OF SECURITIES

**Violations and Aiding and Abetting Violations of
Section 10(b) of the Exchange Act
and Rule 10b-5 thereunder
(Against Both Defendants)**

60.    The Commission realleges and incorporates by reference ¶¶ 1 through 56 above.

61.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

62.    By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

/ / /

/ / /

/ / /

63.    In the alternative, defendants Treadway and Corba, and each of them, knowingly provided substantial assistance to PAFM's, PEA's and PAD's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

64.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendants Treadway and Corba aided and abetted PAFM's, PEA's and PAD's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

### FRAUD BY AN INVESTMENT ADVISER

### Aiding and Abetting Violations of

### Section 206(1) and 206(2) of the Advisers Act

### (Against Both Defendants)

65.    The Commission realleges and incorporates by reference ¶¶ 1 through 56 above.

66.    PAFM and PEA, and each of them, by engaging in the conduct described above, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce:

      a.    with scienter, employed devices, schemes, or artifices to defraud clients or prospective clients;

      b.    engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

67.    By engaging in the conduct described above, PAFM and PEA violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

/ / /

/ / /

- 18 -

68.    Defendants Treadway and Corba, and each of them, knowingly provided substantial assistance to PAFM's and PEA's violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

69.    By engaging in the conduct described above and pursuant to Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), defendants Treadway and Corba aided and abetted PAFM's and PEA's violations, and unless restrained and enjoined will continue to aid and abet violations, of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## FOURTH CLAIM FOR RELIEF

### MISREPRESENTATIONS AND OMISSIONS IN INVESTMENT COMPANY REGISTRATION STATEMENT

### Violations of Section 34(b) of the Investment Company Act

### (Against Both Defendants)

70.    The Commission realleges and incorporates by reference ¶¶ 1 through 56 above.

71.    Defendants Treadway and Corba, and each of them, by engaging in the conduct described above:

    a.    made untrue statements of a material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, the keeping of which is required pursuant to Section 31(a), 15 U.S.C. 80a-30(a);

    b.    omitted to state in such documents facts necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

/ / /

/ / /

- 19 -

72.     By engaging in the conduct described above, defendants Treadway and Corba violated, and unless restrained and enjoined will continue to violate, Section 34(b) of the Investment Company Act, 15 U.S.C. § 80a-33(b).

### FIFTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

### Section 36(a) of the Investment Company Act

### (Against Both Defendants)

73.     The Commission realleges and incorporates by reference ¶¶ 1 through 56 above.

74.     Defendants served or acted within five years of the date of the filing of this action with respect to a registered investment company as an officer, director, member of an advisory board, investment adviser, depositor, or principal underwriter and engaged in acts or practices constituting a breach of fiduciary duty involving personal misconduct.

75.     By reason of the foregoing, defendants should be permanently enjoined from acting in any and all capacities set forth in Section 36 of the Investment Company Act.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining defendants Treadway and Corba, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2), and Sections 34(b) and 36(a) of the Investment Company Act, 15 U.S.C. §§ 80a-33(b) and 80a-35(a).

## III.

Issue a finding that defendants breached their fiduciary duty in a manner involving personal misconduct and permanently enjoining defendants, pursuant to Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a), from serving or acting with respect to any registered investment company as an officer, director, member of any advisory board, investment adviser, depositor, or principal underwriter.

## IV.

Order defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## V.

Order defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e)(1), and Section 42(e) of the Investment Company Act, 15 U.S.C. § 80a-41(e).

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

/ / /

/ / /

/ / /

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: November 10, 2004

Nicolas Morgan
Adam D. Schneir
Attorneys for Plaintiff
Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

[X]    U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036.

Telephone: (323) 965-3998; Fax: (323) 965-3908

On November 10, 2004, I served the document entitled **FIRST AMENDED COMPLAINT** upon the parties to this action addressed as stated on the attached service list:

[X]    **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

    [ ]    **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

    [ ]    **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]    **PERSONAL SERVICE:** I caused to be personally delivered each such envelope by hand to the office of the addressee in the attached service list.

[ ]    **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[ ]    **FAX (BY AGREEMENT ONLY):** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X]    **(Federal)** I declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made. I declare under penalty of perjury that the foregoing is true and correct

Date: November 10, 2004

*Magnolia M. Marcelo*
MAGNOLIA M. MARCELO

**SEC v. PIMCO Advisors Fund Management LLC, et al.**
**United States District Court - Southern District of New York**
**Case No. 04 CV 3464 (VM)**
**(LA-2796)**

SERVICE LIST

Stephen L. Ascher, Esq.
Kronish Lieb Weiner & Hellman LLP
1114 Avenue of the Americas
New York, NY 10036-7798
*Attorney for Defendant Stephen J. Treadway*


Gus Coldebella, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109-2881
*Attorney for Defendant Kenneth W. Corba*