```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/30/06
```

**UNITED STATES DISTRICT COURT**
**STATES DISTRICT COURT**
-----------------------------------X
SECURITIES AND EXCHANGE COMMISSION, :
                      Plaintiff,   :   04 CIV. 3464
          -against-       :   DECISION AND ORDER
STEPHEN TREADWAY,            :
                      Defendant.   :
-----------------------------------X

**Victor Marrero, United States District Judge.**

At the close of plaintiff Securities and Exchange Commission's ("SEC") case-in-chief in the trial of this action, defendant Stephen J. Treadway ("Treadway") moved pursuant to Rule 50(a) of the Federal Rules of Civil Procedure ("Rule 50(a)") for judgment as a matter of law.[1] The SEC submitted a memorandum in opposition. The Court indicated that it would deny the motion; the Court now addresses the factual and legal basis for its decision.

### I.   LEGAL STANDARD

Rule 50(a) of the Federal Rules of Civil Procedure allows a party to move for judgment as a matter of law at any time before the case has been submitted to the jury. See Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999).

---

[1] The facts and legal issues in dispute in this case, familiarity with which is assumed, are set forth in prior decisions by this Court. See SEC v. Treadway, 04 Civ. 3464, 2006 WL 1293499 (S.D.N.Y. May 9, 2006); SEC v. Treadway, 354 F. Supp. 2d 311 (S.D.N.Y. 2005); SEC v. PIMCO Advisors Fund Mgmt., 341 F. Supp. 2d 454 (S.D.N.Y. 2004).

A motion filed pursuant to Rule 50(a) may be granted if a legally sufficient evidentiary basis to support the non-moving party's claim or defense is absent from the record. See Fed. R. Civ. P. 50(a); Wimmer, 176 F.3d at 134; Piesco v. Koch, 12 F.3d 332, 340 (2d Cir. 1993); Parrish v. Sollecito, 280 F. Supp. 2d 145, 151 (S.D.N.Y. 2003). In assessing the merits of a Rule 50(a) motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. See Wimmer, 176 F.3d at 134; Piesco, 12 F.3d at 343; Parrish, 280 F. Supp. 2d at 151. In deciding such a motion, a court may not itself weigh the credibility of witnesses or consider the weight of the evidence. See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998). Thus, judgment as a matter of law should not be granted unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Id. at 289 (quotation omitted).

## II. APPLICATION

Treadway moved to dismiss all counts requiring a scienter element, arguing that (1) no reasonable juror could find that

treadway knew or was reckless in not knowing the salient details of the Canary Capital Partners ("Canary") arrangement; (2) no reasonable juror could find that Treadway knowingly approved any arrangement with stern with knowledge that the arrangement would cause harm to shareholders; and (3) because the prospectus "touchstone" is harm to shareholders, no reasonable juror could find that Treadway knowingly or recklessly made, or aided and abetted, a materially false statement or omission in the prospectus or breached his fiduciary duties.

However, the Court is persuaded that the SEC has presented sufficient evidence from which a reasonable juror could conclude that Treadway knew sufficient details about the trading, or was reckless in not knowing that trading activities were occurring that were inconsistent with the market timing policy disclosed in the PIMCO Funds prospectus.

Specifically, in Treadway's deposition testimony read into the record, he stated that in January 2002 he met with PIMCO Funds executive Kenneth W. Corba ("Corba"), who told him that Edward Stern ("Stern") was interested in investing in the PIMCO Funds, but that Stern and his family were "active traders" that would "from time to time... do some active trading" that "could potentially run afoul" of PIMCO's market timing policy and "wind up in... freezing" stern's accounts.

(Treadway Trial Test. at 551-53). Treadway also stated that he discussed this relationship with his staff at meetings that occurred two or three times a month, and that when he first discussed the relationship, he told his staff that Stern's trading might "catch our attention in terms of monitoring market-timing activities" and that they would give him a "grace period." (Treadway Trial Test. at 565-66). A jury could reasonably infer from Treadway's own testimony that he had knowledge early on during PIMCO's arrangement with Stern, even if he did not know the precise details initially, that trading was going to occur that was inconsistent with PIMCO's market timing policies.

Moreover, after Corba explained Stern's proposal, Treadway warned Corba that both he and Corba had a fiduciary responsibility to the funds and the shareholders. (Treadway Trial Test. at 552.) A juror could reasonably infer that because Treadway felt the need to remind Corba of their fiduciary duties, he knew that the Stern trading might be harmful to the funds and their shareholders, and thus potentially cause a breach of fiduciary duties.

Additionally, in February 2002 Treadway was copied on an email from PIMCO Advisors Distributors' ("PAD") operations manager, Stephen Howell ("Howell"), who worked for Treadway, with the subject, "Large Dollar Investments into PIMCO Class

A from Brean Murray" - this email indicated two large exchanges at the beginning of Stern's trading. (Trial Ex. 8.) In April 2002, Treadway received a series of emails concerning Stern's trading, indicating that the Stern relationship permitted four round trips per month in the PIMCO Funds and that Stern had exceeded this in the Target Fund. (Trial Ex. 48; Howell Trial Test. at 144-48; Treadway Trial Test. at 574-77.) One of these emails, from Corba, stated that he had recently "clarified with them that they get 4 round trips per month." (Trial Ex. 48.) On April 29, 2002, Treadway sent an email to several PAD employees and Corba, directing Stephen Maginn, PAD's head of sales, to "come up with a more precise and limiting definition of what constitutes 4 round trips and let's discuss." (Trial Ex. 49; Treadway Trial Test. at 578, 581). That same day, Treadway was copied on an email from Howell stating that Stern's pattern of trading was "of concern to us" because PIMCO had received redemption orders before purchase orders had settled, creating settlement problems for the PIMCO funds. Treadway recalled that there were "settlement problems" and recalled "discussing" those problems. (Trial Ex. 218; Treadway Trial Test. at 582.)

In addition, Treadway also testified that by May 2002 he was "concern[ed]" that the trading was more like day trading (Treadway Trial Test. at 571); yet he did not stop the trading

5

and allowed it to continue through August or September, and in fact until November 2002. Although Treadway has offered in evidence other explanations for the delay in terminating the trading, including that he was persuaded by Corba not to terminate the trading and that he wanted to avoid adverse tax consequences of a merger between the growth and select growth funds, a juror could reasonably find that he knew or was reckless in not knowing by the Fall of 2002 that the trading conflicted with PIMCO's public disclosures regarding its market timing policy as disclosed in the prospectus.

Although Treadway argues that the "touchstone" of the prospectus is harm to shareholders, and indicated that PIMCO had discretion to allow market timing if it was determined to be not harmful to shareholders, evidence presented at trial indicates that the PIMCO prospectus is reasonably susceptible to other interpretations, including one in which market timing was discouraged or disallowed. For example, the prospectus states that "a pattern of exchanges characteristic of 'market timing' strategies may be deemed by PIMCO advisors to be detrimental to the trust or a particular fund." (Trial Ex. 200.) Wallace Stooks, an independent trustee of the PIMCO Funds, further testified that the PIMCO Funds' policy was not to allow market timing; and he testified that he understood the prospectus to permit discretion to allow more than six

round trips per year only if those investors were not really market timers but had a non-market timing reason for their trades, such as a death in the family resulting in a need to redeem their investments. In addition, Howell and Isabella Albanese, both employees of PAD under Treadway's supervision, testified that PAD monitored market timing and prevented other shareholders from performing frequent exchanges, purchases and redemptions. From this evidence, a juror could reasonably interpret the PIMCO Funds prospectus to discourage or disallow market timing, and therefore that Treadway knew, or was reckless in not knowing, that frequent trading in the PIMCO Funds was occurring that was inconsistent with this policy.

A juror could also reasonably conclude that Treadway knew or was reckless in not knowing that shareholders and the funds might be harmed. As indicated, Treadway was told that the trading might be "active" and could potentially "run afoul" of the market timing policies. Treadway testified that the Stern trading could proceed with "safeguards" (Treadway Trial Test. at 552-53, 555-57), thus suggesting that the trading might have certain inherent risks. Moreover, in May 2002 Treadway presided over a board meeting at which redemption fees to limit harm caused by market timers was discussed. In June 2002 he presided over another board meeting at which he asked for and received authority to impose redemption fees on class

A shares. A memorandum distributed to the Board for the May 7, 2002 meeting stated that PIMCO Advisors believed that trading by market timers harms long term shareholders both by imposing additional transaction costs and harming fund performance. (Trial Ex. 38.) Three portfolio managers testified about the problems that market timing created for mutual funds, and the SEC's expert gave the opinion that market timing creates an "inherent risk" to long-term investors. There is therefore sufficient evidence in the record for a juror to reasonably conclude that Treadway knew of or was reckless in not knowing that the funds and shareholders were at risk of harm.

For these reasons, the Court finds that there is sufficient evidentiary basis in the record to support allowing the SEC's claims involving scienter to go to the jury, and therefore denies Treadway's motion for judgment as a matter of law.

### III.   ORDER

For the reasons stated above, the motion (Docket No. 261) Stephen J. Treadway for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) as regards the claims in this case involving scienter is denied.

**SO ORDERED.**

Dated: New York, New York
       June 29, 2006

                                          _____
                                          VICTOR MARRERO
                                             U.S.D.J.